## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## ANDERSON DIVISION

```
-------------------------------------------------------------X
JOHN DOE,                                   :
                                            :    Civil Action No._____
                         Plaintiff,         :
                                            :    COMPLAINT
              -against-                      :
                                            :
CLEMSON UNIVERSITY, CLEMSON                 :
UNIVERSITY BOARD OF TRUSTEES,              :    (Jury Trial Demanded)
JAMES P. CLEMENTS, individually and :
as agent for Clemson University,            :
ALMEDA JACKS, individually and as          :
agent for Clemson University, ALESIA       :
SMITH, individually and as agent for       :
Clemson University, SUZANNE PRICE,         :
individually and as agent for Clemson      :
University, LORETO JACKSON,                 :
individually and as agent for              :
Clemson University and DAVID               :
FROCK, individually and as agent for       :
Clemson University,                         :
                                            :
                         Defendants.        :
-------------------------------------------------------------X
```

Plaintiff John Doe[1], (hereinafter referred to as "Plaintiff" or "John Doe"), by

his attorneys Schmutz & Schmutz PA, David Aylor Law Offices and Nesenoff &

Miltenberg, LLP as and for his Complaint, respectfully alleges as follows:

---

[1] Plaintiff herewith files a motion to proceed pseudonymously.

## THE NATURE OF THIS ACTION

1.    This case arises out of the actions taken and procedures employed by Defendants Clemson University ("Clemson" or the "University"), Clemson University Board of Trustees ("Defendant Board of Trustees"), James P. Clements ("Defendant Clements"), Almeda Jacks ("Defendant Jacks"), Alesia Smith ("Defendant Smith"), Suzanne Price ("Defendant Price") Loreto Jackson ("Defendant Jackson") and David Frock ("Defendant Frock")(collectively, "Defendants") concerning allegations made against Plaintiff, a male freshman student at Clemson as a result of false allegations of nonconsensual sexual activity with fellow Clemson student Jane Doe.

2.    The allegations involving Jane Doe purportedly refer to what was clearly consensual sexual activity that occurred on the evening of October 24-25, 2015 (the "Incident").

3.    On October 26, 2015, Jane Doe's roommate, C.F., who was not an eyewitness to the encounter and only learned of the alleged incident from Jane Doe after the fact, reported to a friend of a friend's Resident Advisor that Jane Doe had been the victim of sexual misconduct. The R.A. in turn reported this alleged incident to Clemson's Office of Community and Equitable Standards ("OCES").

4.    On November 11, 2015, after encouragement by OCES and

Clemson's Counseling and Psychological Services, Jane Doe submitted a formal

Title IX complaint to Defendant Alesia Smith.

5.    On February 4, 2016, investigators Suzanne Price and Loreto Jackson

issued the Investigation Report, which included a recommendation that the matter

against John Doe proceed to a formal hearing.

6.    On February 18, 2016, John Doe was notified that the case was being

handled according to Clemson's Administrative Hearing procedures. A hearing

was scheduled to take place at 8:30 a.m. on February 26, 2016.

7.    After an unreasonably delayed investigation process, on February 26,

2016, John Doe appeared before an Administrative Hearing Board (the "Hearing")

on the alleged violations against him; namely: (i) alcohol; (ii) disorderly conduct;

(iii) harm to person; and (iv) sexual misconduct.

8.    Ultimately, on February 29, 2016, Chairperson David Frock issued a

decision letter (the "Decision Letter") finding John Doe responsible for all four

charges (the "Decision"). As a result, Defendants imposed the following sanctions:

(i) suspension from the University until August 1, 2016; (ii) disciplinary probation

for the remainder of John Doe's time at Clemson; (iii) eviction from University

housing; (iv) no contact order for the duration of his time at Clemson; (v) entrance

into a counseling program with Clemson University Counseling and Psychological

Services; and (vi) in kind restitution by completion of an approved Sexual Assault Awareness course prior to re-enrollment (collectively, the "Sanction").

9.      John Doe timely submitted an appeal of the Administrative Hearing Board's Decision to Vice President Dr. Almeda Jacks on March 4, 2016. He was subsequently notified that Jane Doe had submitted a cross-appeal to Vice President Jacks, on March 7, 2016.

10.      On March 23, 2016, Dr. Jacks issued a decision upholding the Decision and the Sanction.

11.      On March 30, 2016 John Doe submitted an appeal of Vice President Jacks' decision to President James P. Clements. John Doe requested that the erroneous and baseless Decision finding him responsible for all four charges be reversed.

12.      On March 31, 2016 Jane Doe submitted a cross-appeal of Vice President Jacks' decision to President Clements, requesting that the Sanction be enlarged and that John Doe be expelled.

13.      On April 18, 2016, while both appeals to President Clements remained pending, John Doe received notice from Phi Delta Theta Director of Chapter Services Michael Wahba that Province President Ron Johnson was suspending John Doe from the fraternity, and recommended expulsion.

14.    On May 27, 2016, Chief of Staff Max Allen issued a decision on John Doe's appeal to President Clements, upholding the Decision. However, Mr. Allen egregiously and unilaterally increased the Sanction's suspension length by one year, imposing a suspension on John Doe until August 1, 2017.

15.    John Doe has sustained tremendous damages to his future education and career prospects as a result of the Decision and Sanction.

16.    Throughout the investigative process, Defendants failed to abide by Clemson's own guidelines and regulations and acted in direct violation of federal and/or state law.

17.    A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation; (ii) Defendants improperly advised and advocated on behalf of Jane Doe; (iii) Defendants evidenced a gender bias against John Doe as the male accused throughout the investigative and hearing process; (iv) Defendants made assessments of credibility and evidentiary weight with respect to each party without any logical basis or rationale; (v) Defendants denied John Doe of the opportunity to present and question all relevant witnesses; (vi) Defendants failed to afford John Doe the requisite presumption of innocence required by a preponderance of the evidence standard; and (vii) the unwarranted Sanction was unilaterally and arbitrarily increased, all of which demonstrated substantial

procedural errors in violation of Title IX, the Fourteenth Amendment and other federal and/or state laws.

18.    When Defendants subjected John Doe to disciplinary action, they did so in an arbitrary and capricious way, and in discrimination against him on the basis of his male sex. Defendants failed to adhere to Clemson's own guidelines and regulations, and the guidelines and regulations themselves are inherently discriminatory and insufficient to protect the rights of male students. The Decision reached was discriminatory; given the evidence (or lack thereof), a discriminatory bias against males and the underlying motive to protect Clemson's reputation and financial wellbeing was required for a conclusion of sexual misconduct to be reached.

19.    John Doe has been greatly damaged by the actions of Defendants: his education and career prospects have been severely compromised as he will be unable to gain admission to a graduate school or obtain employment with a disciplinary mark on his academic record. Additionally, as a result of Defendants' actions and inactions, John Doe has suffered physical, psychological, emotional and reputational damages, economic injuries and the loss of educational and career opportunities.

20.    John Doe therefore brings this action to obtain relief based on causes of action for, among other things, violation of Title IX of the Education

Amendments of 1972, violation of the 14th Amendment Procedural Due Process, breach of contract and other state law causes of action.

## THE PARTIES

21.     Plaintiff is a natural person, citizen of the United States and resident of the State of South Carolina. During the events described herein, Plaintiff was a student at Clemson University and resided in a dormitory on Clemson's campus in Clemson, South Carolina.

22.     Upon information and belief, Clemson University is a public science and engineering-oriented research university located in Clemson, South Carolina.

23.     Upon information and belief, the Clemson University Board of Trustees is the governing body of Clemson University. It is composed of 13 members, including six elected by the state legislature and seven successor members. Upon information and belief, it is responsible for setting policy and approving budgets and expenditures.

24.     Upon information and belief, Dr. James P. Clements is a resident of the State of South Carolina and was the President of Clemson University at all relevant times herein.

25.     Upon information and belief, Dr. Almeda Jacks is a resident of the State of South Carolina and was the Vice President of Student Affairs at Clemson University at all relevant times herein.

26.     Upon information and belief, Alesia Smith is a resident of the State of South Carolina and was Associate Dean of Students and Deputy Title IX Coordinator at Clemson University at all relevant times herein.

27.     Upon information and belief, Suzanne Price is a resident of the State of South Carolina and was the Director for Residential Learning at Clemson University at all relevant times herein.

28.     Upon information and belief, Loreto Jackson is a resident of the State of South Carolina and was the Associate Athletic Director at Clemson University at all relevant times herein.

29.     Upon information and belief, David Frock is a resident of the State of South Carolina and was the Executive Director of Campus Recreation at Clemson University at all relevant times herein.

30.     John Doe and Defendants Clemson University, Clemson University Board of Trustees, Clements, Jacks, Smith, Price, Jackson and Frock are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

31.     This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because: (i) the federal law claims arise under the constitution and statutes of the United States; and (ii) the

state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the United States Constitution.

32.    This Court has personal jurisdiction over Defendant Clemson on the grounds that it is conducting business within the State of South Carolina.

33.    This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of South Carolina and is the governing body of Clemson University.

34.    This Court has personal jurisdiction over Defendant Clements on the grounds that he was acting as an agent of Clemson at all relevant times herein.

35.    This Court has personal jurisdiction over Defendant Jacks on the grounds that she was acting as an agent of Clemson at all relevant times herein.

36.    This Court has personal jurisdiction over Defendant Smith on the grounds that she was acting as an agent of Clemson at all relevant times herein.

37.    This Court has personal jurisdiction over Defendant Price on the grounds that she was acting as an agent of Clemson at all relevant times herein.

38.    This Court has personal jurisdiction over Defendant Jackson on the grounds that she was acting as an agent of Clemson at all relevant times herein.

39.    This Court has personal jurisdiction over Defendant Frock on the grounds that he was acting as an agent of Clemson at all relevant times herein.

40.    Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Clemson is considered to reside in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.    Agreements, Representations, Covenants & Warranties Between Plaintiff and Clemson

41.    Plaintiff graduated from a private high school in Charleston, South Carolina in 2015 where he achieved a 3.85 GPA, placing him in the top 15% of his class. He was a member of the National Honors Society, an active member of the Student Senate, participated in the Big Brother Big Sister mentoring program and received varsity scholar athlete awards in baseball, hockey, football and track, in addition to other prestigious awards granted to student athletes.

42.    Setting his sights on a leading liberal arts education in his home state, John Doe applied to Clemson University, for admission to the class of 2019.

43.    Upon his acceptance, Clemson provided John Doe with copies of its school policies, including Clemson's Anti-Harassment and Non-Discrimination Policy ("Non-Discrimination Policy") and the Clemson University Student Code of Conduct ("Code of Conduct")(collectively, the "Policies"), current copies of which are available on Clemson's internet website.

44.    With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, Clemson's Non-Discrimination Policy provides as follows:

> This document defines Clemson University's policy regarding harassment/discrimination. Clemson University is committed to an educational and work environment in which all individuals are treated with respect and dignity, free from harassment and/or discrimination. Accordingly, it is the policy of Clemson University that harassment/discrimination as defined in this policy, by employees, students or nonemployees will not be tolerated. It is also the policy of Clemson University that retaliation against any person who has filed a complaint of harassment/discrimination or who has assisted or participated in any manner in the investigation and resolution of a complaint of harassment/discrimination is prohibited and subject to disciplinary action.
>
> Clemson University will respond promptly to all complaints of harassment, discrimination, and retaliation. Immediate and appropriate corrective action will be taken when it is determined that harassment has occurred.
>
> ….
>
> The policy is intended to meet Clemson University's responsibilities under Titles VI and VII of the Civil Rights Act 1964, the Pregnancy Discrimination Act of 1978, Title IX of the Education Amendments of 1972, Sections 503 and 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Age Discrimination in Employments Act of 1967, the Age Discrimination Act of 1975, the Vietnam Veterans Readjustment Assistance Act of 1974, the Genetic Information Nondiscrimination Act of 2008, the Violence Against Women Act, and applicable provisions of the South Carolina Human Affairs Law.

45.     The Office of Community and Ethical Standards is responsible for resolving student conduct issues. The Code of Conduct provides the process by which students who have been accused of violating one or more of the enumerated sexual misconduct policies are investigated, heard and disciplined.

46.     Clemson's Code of Conduct provides that anyone may initiate a complaint against a student for misconduct. The complaint shall be submitted in writing and directed to the OCES. The Director of OCES is responsible for coordination of disciplinary proceedings. The Director has authority to determine appropriateness of a complaint, accept a student's admission to a violation, impose sanctions, and hear cases involving alleged violations of student regulations.

47.     In cases where the contemplated sanction may include eviction from University Housing, suspension or expulsion, an Administrative Hearing Board will be appointed. The Associate Vice President for Student Affairs or his or her designee will serve as Chairperson of the Board, along with two students, one faculty member and one staff member.

48.     The rights afforded to a complainant and respondent under Clemson's Code of Conduct are inexplicably disparate. In fact, the only right afforded to both parties is the right to choose an advisor to accompany the party to a hearing. The respondent is afforded the following rights:

- the right to remain silent;

12

- pending action on alleged violations will not alter the status of a student, nor shall the right to be present on campus to attend classes be suspended, except when an interim suspension has been imposed;

- the University may process a student's case separately from any action taken by the criminal justice system;

- prior cases of discipline will not be used against a student in determining whether the action is a violation of a student regulation; however, prior discipline can be used in determining a sanction;

- a university official shall inform students in writing of the reasons for any proposed disciplinary action in sufficient time to ensure that student has opportunity to prepare for a hearing;

- the student is responsible for contacting witnesses on his own behalf .

49.    Contrarily, the complainant is afforded the following rights which ensure greater protection of the student's fundamental rights:

- the right to be informed of the discipline process prior to any disciplinary action;

- the right to attend the hearing and the option to provide testimony regarding the incident;

- to be informed in writing of the outcome of the disciplinary hearing;

- to be informed of any appeals filed by respondent;

- the right to appeal the finding of the disciplinary panel.

50.     Evidently, while the rights afforded to a complainant ensure the basic procedural rights of notice and an opportunity to be heard, the same such rights are not guaranteed to a respondent under Clemson's Code of Conduct.

51.     Upon receipt of an incident report or written complaint, the Director of OCES will review the report and contact the respondent by letter, phone, or email to schedule an appointment for a discipline conference.

52.     During this conference, the alleged violations and disciplinary process will be discussed. Respondent will then be given an opportunity to review the information describing the alleged violation and respond to such allegations.

53.     If the facts and/or sanctions concerning the alleged violation cannot be agreed upon by OCES and the respondent, OCES will offer the following options to the respondent: (1) he may plead no contest, accept sanctions imposed and waive his opportunity for an administrative hearing; or (2) he may request a hearing before the administrative hearing board.

54.     When an administrative hearing is requested, or the contemplated sanction is eviction from University housing, suspension or dismissal, the Director or Associate Director of OCES will notify the respondent of the hearing in writing a minimum of five business days prior to the date of the hearing. Such notice shall include the following information: (i) a statement of the specific regulations allegedly violated; (ii) a description of the incident; (iii) the names of possible

witnesses; (iv) a copy of any documents in possession of OCES that will be presented to the Administrative Hearing Board; (v) the possible sanctions to be imposed; and (vi) the time, date and location of the hearing.

55.    The hearing shall be recorded and kept in the OCES office for 6 months; the respondent may request a transcript of the recording, however it will be produced at his own expense.

56.    Demonstrating a process that is not impartial in either appearance or practice, on behalf of the University or at the request of the complainant, the facts, circumstances and evidence will be presented by the Director of OCES to the administrative hearing board.

57.    Further, OCES staff will contact and request the presence of witnesses deemed necessary to appear, on behalf of the University or complainant. Any witnesses contacted by OCES are required to appear.

58.    Contrarily, respondents are charged with the task of contacting and requesting the appearance of their own witnesses, despite the lack of any authority to compel the appearance of one who refuses to appear voluntarily.

59.    Both students must be permitted the opportunity to present and examine statements, facts and any relevant information, present and question their own witnesses and present questions for other witnesses to the Chairperson, in order to refute or respond to testimony.

60.    After all information has been presented, the administrative hearing board will go into closed deliberations to determine whether the student has violated each section of the Code of Conduct which the student is charged with violating. The decision will be made based on a preponderance of the evidence standard.

61.    The Chairperson is responsible for rendering a decision in writing to the respondent. The decision shall include a summary of the findings and the sanctions imposed. The complainant will also be notified of the outcome in cases where the complainant is a "victim of violence."

62.    In cases where the sanction involves suspension or dismissal, the decision of the administrative hearing board may be appealed to the Vice President of Student Affairs within five business days. In cases involving sexual misconduct, either party may file an appeal, thus subjecting the respondent to a form of double jeopardy. Appeals must be based on at least one of the following four grounds: (i) a procedural error so substantial that the student did not receive a fair hearing; (ii) significant information or evidence has become available that was not available previously; (iii) the sanction was arbitrary or grossly disproportionate to the offense; or (iv) the decision was completely unsupported by the evidence.

63.    In decisions resulting in suspension or dismissal, based on an allegation of sexual misconduct, both parties may thereafter appeal the decision of

the Vice President of Student Affairs to the President of the University, within five business days. Such appeals must be based on one of the four above-mentioned criteria. Thus, a complainant is permitted *three* opportunities to pursue a finding of responsibility against a respondent.

64.     Notably, Clemson's Policies do not indicate a timeline for completion of an OCES investigation, in violation of Title IX's requirement that investigations be completed within sixty (60) days.

65.     Curiously, in an attempt to validate any anticipated procedural missteps, the Code of Conduct notes that "deviation from prescribed procedures will not necessarily invalidate a decision or proceeding unless significant prejudice to the referred student is shown to have resulted."

## II.    The Night of October 24, 2015 (the "Incident")

66.     October 24, 2015 started off as an enjoyable day for John Doe. His fraternity, Phi Delta Theta, was planning to host a party that evening, which also happened to be his birthday. He was looking forward to spending the evening with his fraternity brothers at his new home.

67.     Around 8:00 p.m., John Doe began to celebrate his birthday alongside some of his pledge brothers. He consumed approximately five beers and 1 to 2 shots of Fireball over a period of approximately two and a half hours.

68.    At approximately the same time, Jane Doe attended a "pregame" with friends in her dorm room. She self-reported that she consumed an implausible 9 shots before Jane Doe and her friends headed to the party at the Phi Delta Theta fraternity house.

69.    When they left her dormitory, Jane Doe brought a water bottle filled with vodka along with her. On the way to the Compound, an off campus house, Jane Doe clearly told her friends that she wanted to find the birthday boy, John Doe, and give him a birthday kiss.

70.    Jane Doe and her friends arrived to the off-campus party at John Doe's fraternity house at about 10:30 p.m. Upon her arrival, Jane Doe spoke with C.G., her close friend with whom she has had a sporadic physical and romantic relationship. C.G. told Jane Doe to "go have a good time," which visibly upset Jane Doe given she was interested in pursuing a relationship with him. Thereafter, Jane Doe told her friends that she was going to look for John Doe.

71.    John Doe and Jane Doe were friends who had engaged in one physical encounter a few weeks prior. Subsequent to the encounter, Jane Doe repeatedly initiated contact with John Doe, during September and October of 2015, while also continuing to seek a relationship with C.G.

72.    Jane Doe approached B.Z., who was speaking with R.C., and asked about the whereabouts of John Doe. After about 15 minutes, B.Z. agreed to help

Jane Doe locate John Doe, who they observed exiting one of the houses on the

Compound. Jane Doe went up to John Doe and gave him a hug and a kiss on the

lips, in front of several people.

73.    At the time Jane Doe first approached him, John Doe was rather

intoxicated, estimated by B.Z. to be a 7.5 or 8 on a scale of 1-10, with 10 being the

most intoxicated.

74.    Jane Doe was undoubtedly intent on engaging in sexual activity with

John Doe that evening; she sought him out at the party; aggressively initiated a

kiss, in front of numerous witnesses; and told him "if you don't kiss me now, you

won't have sex with me tonight."

75.    Though taken aback by Jane Doe's overt statement, John Doe

complied and began to kiss her. While John Doe generally avoided such public

displays of affection, his inhibitions were lowered as a result of his intoxicated

state.

76.    They engaged in mutual kissing for approximately ten minutes. The

encounter escalated quickly and John Doe asked Jane Doe if she would give him a

birthday blowjob.

77.    Jane Doe agreed and they mutually agreed to leave the party to find

somewhere more private.

78.     As they began to walk away from the party, Jane Doe did not display any signs of intoxication; despite the darkness, she did not stumble, did not slur her words and engaged in intelligible and cognizant conversation with John Doe.

79.     After walking and talking for approximately twenty minutes, John Doe and Jane Doe located an area behind a house in a small covered building that seemed to be very private, where they could continue their intimacy. They each took a sip of vodka from Jane Doe's water bottle and as they resumed kissing, Jane Doe started to undress herself and removed her pants, on her own volition. John Doe questioned what she was doing as he understood that Jane Doe was only going to give him oral sex.

80.     Jane Doe unequivocally responded that she wanted to have sexual intercourse with him. Though he was rather intoxicated, and despite the fact that Jane Doe was the initiator of all physical contact between them, John Doe was still aware of the need to ensure that Jane Doe was coherent and was fully consenting to engaging in sexual intercourse.

81.     As such, John Doe asked her repeatedly if she was sure she wanted to have sexual intercourse with him. Jane Doe consistently responded that she knew what she was doing, and that it was fine to proceed.

82.    John Doe asked Jane Doe whether he should use the condom in his wallet, which he was required to carry at all times as a pledge of a fraternity. Jane Doe agreed that he should use it, so John Doe complied and put on the condom.

83.    They thereafter engaged in consensual sexual intercourse, during which Jane Doe was an active and willing participant.

84.    Subsequently, they began to walk back to the fraternity house. John Doe noticed that Jane Doe suddenly began to have some difficulty walking. As they each began to feel the effect of the alcohol, they walked arm in arm.

85.    Jane Doe gradually became agitated and very emotional about her past boyfriends, including on again/off again boyfriend, and pledge brother of John Doe's, C.G. Jane Doe discussed how terribly her past boyfriends had treated her and commented on how kind John Doe had been to her.

86.    John Doe was not aware that C.G. had ignored Jane Doe earlier in the evening, prior to Jane Doe seeking out John Doe.

87.    When they returned to the house, approximately one hour later, Jane Doe reunited with her girlfriends and B.Z. Knowing that it was John Doe's birthday, B.Z. advised him to return to the party and stated he would make sure that the girls got a safe ride home with the designated sober driver, J.S. Notably, OCES never interviewed J.S. during the investigation.

88.    Jane Doe then sat on the front porch where she began to cry, while talking about C.G. and asking why he didn't love her. Jane Doe and her friends eventually got into the car with J.S., who drove them back to Jane Doe's dorm.

89.    Upon information and belief, after returning to her dorm room, Jane Doe discovered that she did not have the key to her room. She recalled that her key might be with John Doe, evidencing a recollection of who she had spent time with that evening.

90.    Eventually, Resident Advisor L.S., who lived next door to Jane Doe, obtained a temporary key and let the girls into Jane Doe's room. Though L.S. was interviewed by the OCES investigators, she was not called to testify at the Hearing. Significantly, L.S. did not express any concern about Jane Doe's condition upon observing her in the early morning of October 25, and stated Jane Doe was not slurring her words.

91.    Upon information and belief, prior to going to sleep that evening, Jane Doe exchanged numerous hostile text messages with C.G.; these text messages were never produced to the investigators.

92.    The following morning, John Doe woke up to a text message from Jane Doe, which he received at 10:45 a.m. Jane Doe first asked whether he had seen the key to her dorm room. Demonstrating a clear recollection of the events from the previous evening, Jane Doe also instructed John Doe to not tell C.G.

about what had happened between them the night before. Significantly, Jane Doe would later omit these text messages from her submission to the OCES Investigators. When John Doe identified this critical piece of information, the Investigators arbitrarily chose to ignore this piece of evidence and did not investigate it further.

93.    Also that morning, Jane Doe told her close friend J.H., that she had engaged in sexual intercourse with John Doe the previous evening.

94.    Notwithstanding that Jane Doe discussed the sexual encounter with both John Doe and J.H. the following morning, Jane Doe would later claim that she did not learn that she had engaged in sexual intercourse with John Doe until C.G. confronted her about it later that day, October 25, around 5:30 p.m.

95.    Apparently, C.G. advised Jane Doe that he had seen a group text message, within which John Doe stated he had sex with a girl on his birthday, the night before. This text message was initially sent to J.S. alone; yet, J.S. subsequently copied and pasted John Doe's text message into a group chat, of which C.G. was a member. Putting two and two together, C.G. learned that the girl referred to by John Doe was Jane Doe.

96.    Given Jane Doe's primary concern was salvaging her relationship with C.G., Jane Doe readily embraced C.G.'s assumption that Jane Doe must not

have been capable of consenting to the sexual activity with John Doe and

therefore, John Doe had raped her.

97.    Later that same day, John Doe received a message from C.G. accusing

him of raping Jane Doe. John Doe was utterly shocked by these false and hurtful

allegations, as the sexual encounter had been completely consensual, confirmed by

Jane Doe's repeated verbal agreement. Moreover, if either party had been unable to

consent due to incapacitation, it would have been John Doe.

98.    Curiously, Jane Doe subsequently developed selective amnesia. She

claimed that she had no memory of what had occurred between her and John Doe,

notwithstanding her 10:45 a.m. text message to John Doe in which she specifically

advised John Doe not to tell C.G. about it.

99.    On October 26, 2015, Jane Doe's roommate C.F., who was not an

eyewitness to the encounter and only learned of the alleged incident from Jane Doe

after the fact, reported to a friend of a friend's R.A. that Jane Doe had been the

victim of sexual misconduct. Curiously, C.F. did not contact Jane Doe's Resident

Advisor and neighbor, L.S., who had observed Jane Doe on the evening in

question.

100.    The R.A. in turn reported the alleged incident to OCES.

Notwithstanding that C.F. was the original complainant, OCES did not question

C.F. at any time during the investigation or adjudication process.

101.   Upon information and belief, on October 28, 2015, Jane Doe's mother arrived to Clemson.

102.   On October 29, 2015, Jane Doe reported the alleged incident to Chrystal Anderson ("Ms. Anderson"), a counselor at the university's Counseling and Psychological Services ("CAPS").

103.   Nonetheless, Jane Doe voluntarily attended events at the Compound the following two weekends: during the weekend of October 30, 2015 she attended a Halloween party and on the weekend of November 6, 2015, Jane Doe attended another party at the Compound.

104.   Upon information and belief, on November 6, 2015, Jane Doe sought treatment at a local hospital for a concussion resulting from a fall that occurred while she was intoxicated.

105.   On November 11, 2015, Jane Doe submitted a formal Title IX complaint to Defendant Smith. John Doe subsequently received a Notice of Investigation and No Contact Order advising him that an "impartial investigation of this complaint" would be conducted.

106.   The Notice of Investigation letter falsely indicated that a "sexual assaulted occurred on October 2, 2015 at an off-campus location" (sic). The Notice of Investigation did not identify the provisions of Clemson's Policies that John Doe allegedly violated, and did not correctly identify the date of the consensual

encounter between the parties. Evidently, Defendant Smith initiated the investigation based solely upon her interview with Jane Doe.

107.    Thereafter, Defendant Smith appointed two investigators from a list of internal colleagues who had volunteered for the position, Director for Residential Learning Suzanne Price and Associate Athletic Director Loreto Jackson (the "Investigators").

108.    Upon information and belief, neither Defendant Smith nor Defendant Jackson has received the requisite training related to the investigation of Title IX complaints.

109.    On December 1, 2015, the Investigators met with Defendant Smith to review the information gathered to date.

110.    On December 3, 2015, more than three weeks after the complaint had been filed, Jane Doe met with the Investigators for the first time.

111.    On December 10, 2015, subsequent to the Investigators' interview of witness C.G., John Doe met with Investigators along with his advisor John Fix. John Doe was questioned by the Investigators notwithstanding that he had not been made aware of the exact nature of the allegations against him or the provisions he was charged with violating.

112.   At some point between December 10, 2015 and January 13, 2016, Jane Doe appeared for a second interview. John Doe thereafter appeared for his second interview, on January 13, 2016.

113.   On January 15, 2016, Defendant Price notified John Doe by email that she would not be able to provide him with a copy of the Investigation Report as there "may be additional information related to the Title IX case that may need to be part of the report." John Doe was not made aware of such new information.

114.   On January 21, 2016, Ms. Anderson submitted an affidavit to OCES in which she diagnosed Jane Doe as suffering from Post-Traumatic Stress Disorder. Significantly, upon information and belief, Ms. Anderson holds an M.A. in Education and is an LPC/1. This designation is for a counselor who has completed the educational and examination requirements to become a licensed counselor but has not completed supervised practice.

115.   Notwithstanding, Ms. Anderson falsely identified herself as a "licensed counselor" and presented her findings as being based on her "professional assessment and treatment of [Jane Doe]." Ms. Anderson justified Jane Doe's failure to report the incident herself, concluding that "she, like many others impacted by trauma, indicated a desire to move on from the situation immediately rather than having to put time and energy into focusing on the

endured traumatic event…This again is a defense against the vulnerability involved."

116.    Upon information and belief, Ms. Anderson does not have the clinical experience to qualify as someone licensed to provide psychotherapy according to the National Center for PTSD. This "diagnosis" was in fact opinion and not a professional evaluation by a licensed psychiatrist or physician to be considered as evidence.

117.    Further, Ms. Anderson ultimately served as both a witness and an advisor to Jane Doe during the investigation process, after encouraging her to report the alleged incident as a Title IX complaint.

118.    Upon information and belief, C.G. attended every one of Jane Doe's counseling sessions with Ms. Anderson.

119.    On January 27, 2016, Defendant Smith notified John Doe that the original restrictions imposed on November 12, 2015 were being amended. The following additional interim measures were imposed: John Doe was restricted from attending University recognized fraternity events not hosted by his fraternity; he was only allowed to attend official events sponsored by Phi Delta Theta; in the event he did attend any non-recognized events or programs and Jane Doe was in attendance, either on or off campus, he would need to leave the area immediately; he was restricted from using the second floor of the Cooper Library; and he was

restricted from entering Harcomb Dining Hall at any time. Such measures were to remain in effect until the student conduct process was concluded. Notably, John Doe still had not been made aware of the exact nature of the charges against him.

120.    On January 28, 2016, Jane Doe's personal attorney submitted additional evidence in support of her complaint.

121.    On February 4, 2016, the Investigators issued the Investigation Report, with recommendations that the matter proceed to a formal hearing.

122.    Upon completion of the investigation, Defendant Smith reviewed and published the final Investigation Report. Defendant Smith, unsurprisingly, accepted without question the recommendation of the Investigators she had appointed, and made a determination that there was sufficient evidence to require an administrative hearing.

123.    On February 11, 2016, Defendant Smith notified John Doe that a disciplinary meeting would take place on February 11, 2016 at 4:30 p.m. The notice of Hearing incorrectly identified the date of the alleged incident as October 26, 2015. Despite the fact that three months had passed since the filing of Jane Doe's formal complaint, this was the first date on which John Doe was notified of the provisions he was alleged to have violated: (i) alcohol; (ii) disorderly conduct; (iii) harm to person; and (iv) sexual misconduct.

124.    Clemson's Policies define Drug and Alcohol misconduct as follows:

a.  No student shall unlawfully manufacture, use, possess, distribute or dispense alcohol or any controlled substance or illegal drug or misuse any legal substance for the purpose of intoxication.
b.  No student under legal age shall possess, sell, purchase or consume alcoholic liquor, beer or wine.
c.  No student of legal age shall purchase for or sell or provide to a person under legal age any alcoholic liquor, beer or wine.
d.  No student of legal age shall possess or consume alcoholic liquor, beer or wine except in areas designated by the University.
e.  No student shall violate any provisions of the University Drug and Alcohol Policy.

125.  Disorderly Conduct is defined in relevant part as follows:

No student shall take any action which is disorderly, lewd or indecent or be found in a grossly intoxicated condition...
No student shall take any action which intentionally interferes with or disrupts normal University or University-sponsored activities including, but not limited to, teaching, service, research or administration.

126.  Harm to Person is defined as follows:

No student shall cause physical harm or threaten to cause physical harm to another person, nor shall any student take any action which creates a danger to any person's health, safety or personal well-being.

127.  Sexual Misconduct is defined as:

Any other nonconsensual conduct of a sexual nature including but not limited to touching, fondling, kissing, groping, indecent exposure, sex-based cyber-harassment, peeping or other voyeurism, forcing others to view sexual activity, and/or the non-consensual photography, video or audio taping of sexual activity.

128.  Consent is defined as follows:

Consent requires speech of conduct indicating a freely given, un-coerced agreement to engage in sexual contact. Consent may not be

inferred from silence or passivity alone and a current or previous relationship is not sufficient to constitute consent. Consent may be withdrawn at any time prior to or during a specific sexual act by either person. To be valid, the person giving consent must be physically and mentally able to:

> (1) understand the circumstances and implication of the sexual act;
> (2) make a reasonable decision concerning the sexual act; and
> (3) communicate that decision in an unambiguous manner.

In the absence of mutually understandable words or actions, it is the responsibility of the initiator, or the person who wants to engage in the specific sexual activity, to make sure that he/she has the consent from his/her partner(s) prior to initiating sexual activity….There are a number of factors which may limit of negate a person's ability to consent to a sexual act. These include but are not limited to age, impairment due to the influence of alcohol or drugs….In order to find no consent under one of these circumstances, there must be a finding that the complainant was unable to consent and a finding that the respondent knew or had reason to know the complainant was unable to consent. Intoxication of the respondent is not an excuse for failure to obtain consent or failure to know of the complainant's inability to consent.

129.    On February 18, 2016, John Doe was notified by Defendant Smith that a hearing on the four charges was scheduled to take place on February 26, 2016 at 8:30 a.m. Defendant Smith identified the witnesses that would possibly appear at the Hearing as Jane Doe, C.G, O.P., Z.B., H.S. and L.S. Defendant Smith advised John Doe that if he would like additional witnesses to attend, he would need to procure their appearance on his own and provide Defendant Smith with a list of such witnesses within four days, by February 22, 2016.

130.   The notification of hearing failed to comply with Clemson's Policies as it did not identify the complainant, did not include a description of the incident, did not identify the documents in possession of OCES that would be presented to the Administrative Hearing Board and did not identify the possible sanctions to be imposed.

131.   On February 20, 2016, John Doe attempted to file an incident report form against C.G. based on his violation of the OCES policies against confidentiality and retaliation. Despite assurances from OCES that Jane Doe, as well as all students interviewed during the investigation process, were forbidden from speaking publicly about the investigation pursuant to the rules set forth by OCES, C.G. openly discussed the alleged incident and referred to John Doe as a "rapist" around Clemson's campus, as heard by at least seven students.

132.   On February 20, 2016 John Doe also attempted to file a complaint against Jane Doe on the grounds that she engaged in sexual activity with John Doe without his consent and engaged in subsequent harassing and retaliatory behavior, in conspiracy with her boyfriend C.G.

133.   However, Defendant Smith informed John Doe that if he filed the foregoing complaints, they would be considered retaliatory and would result in his immediate expulsion. Defendant Smith thereby precluded John Doe from exercising his rights under Clemson's Policies and pursuing his meritorious

complaints against Jane Doe and C.G. As such, Defendants failed to consider or take any action with respect to John Doe's complaints.

134.    On February 22, 2016, John Doe submitted to Defendant Smith his list of witnesses for the Hearing; the witnesses identified included his mother, his father, A.R., R.C., B.Z., C.C., S.H., J.H., G.P., J.W., C.K., and C.F.

135.    Among the witnesses identified by John Doe was J.H., a witness critical to the veracity of Jane Doe's testimony and the exculpation of John Doe. Inexplicably, Defendants failed to identify J.H. as a relevant witness. Thus, John Doe was left to contact J.H. on his own and request her voluntary appearance. However, as J.H. refused to appear, John Doe was left with no means by which to compel her crucial testimony at the Hearing.

136.    On February 26, 2016, John Doe appeared before an Administrative Hearing Board on the charges against him. The Administrative Hearing Board was composed of faculty member Dr. Neil Burton, staff member Fredda Owens, and students Fred Tugas and Marisa Covington (the "Board"). Executive Director of Campus Recreation David Frock served as the Administrative Hearing Chairperson. The Hearing was also attended by Jane Doe, Defendant Jackson and Defendant Smith, who served as Hearing Officer.

137.    The Board determined that there was a preponderance of the evidence to suggest that John Doe should have known Jane Doe was incapacitated during

the incident and was unable to give consent, notwithstanding that conclusive

evidence of incapacitation was never established during the investigation or the

Hearing, and conflicting testimony came from every witness as to what, when,

where and how much alcohol Jane Doe drank on the day of the alleged Incident.

138.   Nevertheless, on February 29, 2016, Defendant Frock issued a

Decision Letter finding John Doe responsible for all four charges.

139.   Defendant Smith recommended that John Doe be expelled from the

University, on the grounds that the encounter occurred in what she viewed as a

"public location", notwithstanding that, according to the Investigation Report, the

secluded location was chosen together by Jane Doe and John Doe.

140.   Defendant Frock instead issued an unwarranted one semester

suspension, along with numerous conditions including disciplinary probation,

eviction from University housing, imposition of a continuing no contact order,

completion of approved counseling and in-kind restitution.

141.   The Decision Letter failed to provide any rationale for the Decision or

the weight afforded to each piece of evidence and testimony, vaguely stating; "in

reviewing all the information in this case, there was no suggestion of force used by

the respondent. When reviewing all credible witness information, there is a

preponderance of the evidence to suggest the complainant was incapacitated during

the incident and unable to give consent."

142.    At no time during or after the Hearing did Defendants Smith or Frock advise John Doe about the appeal process. Instead, John Doe fortuitously crossed paths with Defendant Smith upon moving out of his dorm room at which point John Doe's advisor inquired about the appeal process. Defendant Smith notified John Doe that he was permitted to appeal the Decision within five business days.

143.    The Decision Letter of February 29, 2016 similarly advised that an appeal of the Board's Decision could be submitted within five business days to Defendant Jacks, by March 4, 2016. However, Defendants' nebulous rationale for the Decision and Defendant Smith's intentional obstruction of the release of the Hearing transcript denied John Doe of a meaningful opportunity to appeal.

144.    Thereafter, C.G. and Jane Doe engaged in repeated acts of harassment and retaliation against John Doe.

145.    For instance, on February 27, 2016, C.G. posted to social media website Snapchat a message stating "Goodbye" with a hand waving this gesture.

146.    On February 28, 2016, C.G. taunted John Doe and his fraternity brothers as they awaited entrance into the Senate Chambers for their chapter meeting. C.G., a former pledge of the fraternity was well aware of the time and location of such meetings. C.G. mocked approximately 60 members of the fraternity, including John Doe, when he stated "haha it is too bad you are all down one person now," clearly in reference to John Doe. When John Doe identified

himself and indicated that they were not down on person, C.G. proceeded to repeatedly ask John Doe why he was still there. C.G. then proceeded to shout and cuss at John Doe, in front of his fraternity brothers, resulting in several brothers asking him to leave.

147.    On February 29, 2016, John Doe was leaving the library with a friend, from a location permitted by the No Contact Order, when he noticed C.G. and Jane Doe were glaring, watching him intently as he exited the area.

148.    Despite John Doe's request that OCES conduct a thorough and comprehensive investigation concerning the underlying incident, and subsequent acts of harassment and retaliation arising therefrom, Defendants failed to take appropriate steps to ensure resolution of the foregoing in a fair, impartial and timely manner.

149.    On March 1, 2016, John Doe received an email from OCES, requesting that he attend a meeting with Defendant Smith the following day, March 2, to discuss an incident recently reported to their office.

150.    At this meeting, Defendant Smith reprimanded John Doe, dismissing his complaint on the grounds that he had not come forward sooner. Yet, contrarily, Defendant Smith accepted Ms. Anderson's explanation for Jane Doe's failure to personally file her Complaint immediately after the Incident, on the grounds that she had been traumatized.

151.    Incredibly, rather than conducting a thorough and impartial assessment of John Doe's complaint against C.G., on March 2, 2016, Defendant Smith imposed an additional No Contact Order against John Doe, with respect to C.G.

152.    Thereafter, John Doe timely submitted an appeal of the Board's Decision to Defendant Jacks on March 4, 2016. His appeal was based on the following grounds: a procedural error so substantial that he did not receive a fair hearing and the Decision was completely unsupported by the evidence.

153.    On March 7, 2016, John Doe was notified that Jane Doe had submitted a cross-appeal of the Board's Decision to Defendant Jacks.

154.    On March 10, 2016, Defendant Smith issued a No Contact Order with respect to Jane Doe as against the entire Phi Delta Theta fraternity, based on the February 28 incident.

155.    On March 23, 2016, Defendant Jacks issued a decision upholding the findings and sanction of the Hearing Board. Defendant Jacks' decision letter was perfunctory in that it failed to provide any rationale for her decision or explain the basis for her conclusion, vaguely stating "After carefully reviewing your disciplinary case, I am upholding the decision rendered by the hearing board on February 26, 2016." The failure to provide any explanation for her conclusion again deprived John Doe of a meaningful opportunity to appeal.

156.    On March 24, 2016, John Doe received an email from Clemson's University Housing and Dining, which indicated as follows: "University Housing & Dining has been notified that you have submitted an official university withdrawal. Due to your withdrawal from the University, you are required to check out of University Housing. You have 48 hours from 3/24/2016 to check out with your community staff."

157.    In fact, John Doe did not submit an official university withdrawal. When John Doe followed up with Karen Gibson from University Housing, Ms. Gibson provided John Doe with a copy of the form they had received concerning his "judicial withdrawal." The form was authorized by Dean Jeffrey Appling on March 24, and made effective as of February 26, 2016, the date of the Hearing.

158.    Subsequently, Associate Dean for Curriculum Jeffrey Appling admitted the university initiated withdrawal was his error - he prematurely pulled the trigger on John Doe, without considering that John Doe's appeal was still pending before Defendant Clements. This outrageous misstep further evidenced the procedural incompetence and irregularities in Clemson's disciplinary process.

159.    On March 30, 2016 John Doe submitted an appeal of Defendant Jacks' decision, on the same grounds as his initial appeal: the existence of procedural errors so substantial that he did not receive a fair hearing and the decision was unsupported by the evidence. John Doe requested once again that the

erroneous and unsubstantiated decision finding him responsible for all four charges be reversed.

160.  On March 31, 2016 Jane Doe submitted a cross-appeal of Defendant Jacks' decision to Defendant Clements requesting that the sanction be enlarged and that John Doe be expelled. Jane Doe asserted the sanction was disproportionate to the offense and deprived her of access to education at Clemson, in violation of Title IX.

161.  On April 18, 2016, while both appeals to Defendant Clements remained pending, John Doe received notice from Phi Delta Theta Director of Chapter Services Michael Wahba that Province President Ron Johnson suspended John Doe from the fraternity, and recommended expulsion. The cause for this discipline was identified as "Title XVI, Section 155, of the Code of Phi Delta Theta- "conduct unworthy of a member of Phi Delta Theta and violations of the Bond, the constitution of the fraternity." The suspension was effective immediately.

162.  Upon information and belief, this notice from the fraternity was prompted by its receipt of the confidential Decision Letter dated February 29, 2016.

163.  Upon information and belief, given the limited number of individuals with access to the Decision Letter, either Jane Doe or C.G. improperly disclosed

this confidential document to a third-party, the Phi Delta Theta headquarters,

notwithstanding the pending appeal and a final determination on the charges.

164.    When John Doe raised this significant procedural and privacy

violation with OCES, Defendant Smith erroneously and ignorantly advised him

that Jane Doe was permitted to disclose this information to a third party under Title

IX and the Clery Act.

165.    On May 27, 2016, Chief of Staff Max Allen issued a decision on John

Doe's appeal to Defendant Clements, upholding the Decision of the Board. Mr.

Allen unilaterally increased the original sanction by one year, finding "the

appropriate sanction is a suspension from Clemson University through August 1,

2017." Mr. Allen further instructed that all other sanctions outlined in the February

29, 2016 Decision Letter will remain in place; if such sanctions are successfully

adhered to, John Doe will be eligible to re-enroll for the 2017 fall semester.

Effectively, compliance with all conditions of the suspension still will not

guarantee re-admission for John Doe.

### III.    Failure to Conduct a Thorough and Impartial Investigation

166.    Clemson's Policies provide: "Clemson University is committed to an

educational and work environment in which all individuals are treated with respect

and dignity, free from harassment and/or discrimination." Further, "Clemson

University will respond promptly to all complaints of harassment, discrimination, and retaliation."

167.    Notwithstanding, Defendants performed a one sided and biased investigation in favor of Jane Doe's allegations of sexual misconduct.

168.    Here, the report of alleged misconduct was not initiated by Jane Doe, but by her roommate, C.F., who was not with Jane Doe on the subject evening. C.F. reported the alleged misconduct to a friend of a friend's Resident Advisor, rather than to Jane Doe's own R.A. and neighbor, L.S., who observed Jane Doe on the subject evening. This R.A. ultimately made a report to the OCES on behalf of Jane Doe.

169.    Thereafter, OCES contacted Jane Doe and urged her to meet with a counselor from Counseling and Psychological Services. At Defendants' insistence, Jane Doe met with Ms. Anderson from CAPS, who ultimately persuaded Jane Doe to submit a formal Title IX complaint.

170.    An investigation of the complaint began three weeks later by the Investigators. Upon information and belief, neither of these two university employees had professional experience as a trained investigator, nor the requisite level of experience to ensure a fair, thorough and impartial investigation of the allegations against John Doe.

171.    The lack of experience or training on the part of either Defendant

Price or Defendant Jackson resulted in a procedurally flawed and superficial

investigation process. Under the direction of Defendant Smith, and in response to

both internal institutional pressure and external pressure from the United States

Department of Education, the Investigators pursued an investigation calculated to

lead to the foregone conclusion that John Doe was guilty of the misconduct

alleged.

172.    For instance, though multiple witnesses reported that Jane Doe sought

out John Doe on the subject evening, approached him to give him a birthday kiss,

voluntarily walked over to Chipotle with John Doe, removed her own pants and

told John Doe she wanted to have sex with him, and both parties were intoxicated

to some degree, John Doe was nonetheless found responsible for all four charges.

173.    Moreover, despite their assurances that witnesses would receive a

copy of their own interview testimony prior to the Hearing, the Investigators failed

to provide the witnesses with copies of their own statements, to verify the

summary of their testimony as transcribed.  As such, when questioned about this

failure at the Hearing, Defendant Jackson claimed lack of knowledge regarding

why witness testimony provided at the hearing was inconsistent with the witness

summaries included within the Investigation Report.

174.   Evidently, the Investigators presented unsubstantiated information as fact to the Board.

175.   Moreover, while credibility of the parties is key in determining what actually occurred in a he said/she said situation such as this one, the Investigators failed to call critical witnesses to testify at the Hearing.

176.   For instance, Defendants never interviewed Witness C.F., the individual who initiated the complaint against John Doe, and did not require the appearance of L.S. at the Hearing, one of the last individuals to observe Jane Doe's condition at the end of the subject evening.

177.   Additionally, Defendants failed to request the appearance of Witness J.H. at the Hearing, notwithstanding the she was the first person to speak with Jane Doe the day after the alleged Incident. According to Witness J.H.'s statement to Investigators, Jane Doe told her early the following morning that she had engaged in sexual intercourse with John Doe, prior to ever speaking with C.G. Given Jane Doe's claims that she did not recall the encounter and only learned of it through C.G. later that day, J.H.'s testimony was critical to establishing the veracity of Jane Doe's claims and demonstrating the credibility of each party under a preponderance of the evidence standard.

178.   Clemson's Code of Conduct provides that OCES staff will contact and request the appearance of witnesses deemed necessary to appear, "on behalf of the

University"–in essence, on behalf of the complainant. Contrarily, accused students are charged with the task of contacting and requesting the appearance of witnesses in support of their defense.

179.    While witnesses contacted by OCES are obligated to appear for a hearing, a respondent is left without any authority to compel the appearance of a witness he deems necessary, should they fail to comply.

180.    Thus, because J.H. was not identified by the Investigators as a witness for the University to present, John Doe was required to procure her appearance on his own. As J.H. refused to appear voluntarily, John Doe was left without recourse to compel her appearance; while OCES could have required J.H. to testify, it intentionally declined to do so, aware that her testimony could exonerate John Doe.

181.    Furthermore, while Defendants Price and Jackson were designated as co-investigators of the investigation, Defendant Price acted as Primary Investigator.

182.    Yet, inexplicably, OCES selected Defendant Jackson to testify at the Hearing about the findings in the Investigation Report. Investigator Price did not even appear, depriving John Doe of the opportunity to question this crucial witness and critically damaging the fairness and full disclosure necessary for a fair hearing.

183.    Indeed, Defendant Jackson, who did not conduct any of the interviews personally, was unable to verify testimony collected or explain why witness

statements at the Hearing differed from, and directly contradicted, those presented within the Investigation Report.

184.    Further, when Defendant Jackson was questioned about certain items within the Investigative Report, she was unable to provide straight answers; stating either she did not "recall" or "it was a long time ago, we wrote down what we were told." She further stated that her role as investigator was only to present the factual evidence and not to make any judgments. However, she certainly made judgments when the Investigative Report included hers and Defendant Price's recommendation that Clemson move forward to a hearing on the charges against John Doe. Nonetheless, the Board accepted the Investigation Report as fact.

185.    Moreover, during the Hearing, Defendant Frock demonstrated an inherent bias against John Doe as the male accused when he arbitrarily rejected a number of key questions posed by John Doe, while accepting almost all of Jane Doe's submitted questions.

186.    Further evidencing the inadequacy of the Hearing, members of the Board were inefficiently qualified. Defendant Frock lacked the requisite training to preside over the Hearing, and was unfamiliar with the proper protocol. When uncertain about how to proceed, he repeatedly conferred with Defendant Smith, as if she were the judge of the proceedings, to make a ruling.

187.   While Clemson's Code of Conduct requires that all procedural questions are subject to the final decision of the chairperson at a hearing, Defendant Smith guided the proceeding by clarifying Defendant Frock's instructions, advising Defendant Frock as to how to resolve certain issues, cross-examining John Doe and correcting Defendant Frock's numerous missteps- for instance, omitting an explanation of the burden of proof and misrepresenting the parties' ability to appeal.

188.   In fact, notwithstanding that such responsibility was outside the scope of Defendant Smith's role as OCES Director, Defendant Frock repeatedly turned to Defendant Smith to inquire as to the proper procedures.

189.   Undoubtedly, Defendant Frock was a mere figurehead while Defendant Smith in actuality steered the entire adjudication. Notably, Clemson's Policies do not identify the responsibilities of the Hearing Officer, thus allowing Defendant Smith unfettered discretion to act in any manner she chose.

190.   By appointing herself to multiple roles including prosecutor, judge and witness for Jane Doe, Defendant Smith utilized her various positions to assure a finding of responsibility against John Doe.

191.   In fact, Defendant Smith also appeared as a witness and testified in support of Jane Doe. Defendant Smith addressed the Board to advocate that it impose the maximum sanction of expulsion of the Plaintiff, notwithstanding that

the Code does not permit a witness to address the panel to recommend sanctions. This further allowed Defendant Smith to assert her authority in numerous capacities by inserting herself into the Hearing, creating a conflict of interest.

192.    In response to the selected questions of John Doe's which were allowed by Defendant Frock, Jane Doe made numerous contradictory statements and provided an account of events that changed with each retelling. For instance, while she was able to detail selective quotes from date of the alleged incident that supported her claims, she was unable to remember much of anything else.

193.    Although evidence of incapacitation was not established, the Investigation Report did include an unsubstantiated diagnosis of PTSD (Post Traumatic Stress Disorder) submitted by Jane Doe. The OCES improperly allowed witness testimony and a signed affidavit from Ms. Anderson to support this conclusion.

194.    Upon information and belief, Ms. Anderson holds an M.A. in Education and is an LPC/1. This designation is for a counselor who has completed the educational and examination requirements to become a licensed counselor but has not completed supervised practice. Ms. Anderson did not have the clinical experience to qualify as someone licensed to provide psychotherapy according to the National Center for PTSD. This "diagnosis" was in fact opinion and not a

professional evaluation by a licensed psychiatrist or physician to be considered as evidence.

195.   As such, the Board improperly placed substantial weight on the testimony of Ms. Anderson.

196.   While serving as Jane Doe's advisor, Ms. Anderson also testified during the Hearing that in her "clinical and professional" assessment the PTSD experienced by the Jane Doe due the alleged incident would perpetuate if the complainant feared a risk of encounter with John Doe. Despite the lack of experience or proper qualifications, Ms. Anderson was allowed to advise the Board of the appropriate sanction for her "patient."

197.   Further, the investigation was replete with administrative errors demonstrating the inadequacy and haphazard state of Clemson's Title IX department. For instance, Defendants incorrectly identified the date of the alleged incident in various critical documents: the Notice of Investigation letter listed October 2, 2015 as the date of alleged incident; the Notice of Hearing letter indicated October 24, 2015 as the date of alleged incident, and the Notice of Charges letter identified October 26, 2015 as the date of alleged incident, none of which were accurate.

IV.    **Failure to Avoid Conflicts of Interest**

198.    The U.S. Department of Education's 2011 Dear Colleague Letter outlines the responsibilities of the Title IX Coordinator.

199.    Specifically, the Dear Colleague Letter advises that the Title IX coordinator should not have other job responsibilities that may create a conflict of interest.

200.    The coordinator's responsibilities include overseeing all Title IX complaints and identifying and addressing any patterns or systemic problems that arise during the review of such complaints and reviewing the recipient's disciplinary procedures to ensure that the procedures comply with the prompt and equitable requirements of Title IX.

201.    Notwithstanding, Clemson's Code of Conduct provides that the Director of Community and Ethical Standards and his/her designee may present the facts, circumstances and evidence on behalf of the University or on behalf of the complainant to the hearing board, creating a clear conflict of interest when the University is essentially permitted to act as complainant.

202.    Moreover, the Code of Conduct requires a student suspended as a result of a disciplinary hearing to petition for admission through the director of Community and Ethical Standards or his/her designee. This is a certain conflict of interest when the very person who issued the decision to suspend an accused

student is also the individual who determines whether he should be readmitted to the University. Fair process would require the petition for re-admission be considered by a neutral party unfamiliar with the underlying disciplinary investigation.

203.    Significantly, the Director of the Office of Access & Equity at Clemson is also the University's Title IX Coordinator, Jerry Knighton. Similarly, the Director of the Office of Community and Ethical Standards is also Deputy Title IX Coordinator, Alesia Smith. The combination of these roles, rather than appointment of an independent third party to act as Title IX Coordinator, presented substantial conflicts of interest. Certainly, Defendant Smith had a predisposition towards finding accused students responsible for misconduct given the significant pressure imposed on schools to handle sexual misconduct complaints aggressively.

204.    Defendant Smith's personal bias against John Doe as the male student accused of misconduct was evident throughout the investigation and adjudication process. She acted as witness, prosecutor and judge to steer the process from the initial report made to OCES through and including the Decision and Sanction to determine the outcome of responsibility against John Doe.

205.    Not only did Defendant Smith select the investigators from among a list of internal colleagues at the University who had volunteered for the position, but upon completion of the investigation, she also reviewed and published the final

Investigation Report, and made the determination that there was sufficient evidence to require an administrative hearing.

206.    The hostile environment promoted by Defendant Smith during the Hearing unduly influenced the Board against John Doe.

207.    Notably, Defendant Smith is currently under scrutiny for her involvement in the investigation of a recent incident at Clemson in which an African-American banner on campus was defaced on April 11, 2016.

208.    Upon information and belief, Defendant Smith was recused from any OCES proceedings related to the investigation of the "#Clemson5", a group of Clemson students who were arrested following their refusal to leave a sit-in which arose in response to the seemingly racially motivated incident.

209.    In an attempt to identify the responsible individuals, students submitted multiple Freedom of Information Act requests to various Clemson administrators, including Defendant Smith.

210.    Upon information and belief, Defendant Smith's son was one of the students arrested, as part of the #Clemson5.

211.    Upon information and belief, Defendant Smith attempted to prevent the investigation of these students for violations of Clemson's Code of Conduct, declining to identify one of the arrested students as her son.

212.   Evidently, Defendant Smith intentionally overlooked her own son's potential violations of the Code of Conduct, choosing to selectively bring charges against different students.

213.   Upon information and belief, Defendant Smith was ultimately recused from such investigation by the OCES.

214.   The foregoing demonstrates the ongoing unprofessional behavior exhibited by Defendant Smith in her role as Clemson's Title IX Coordinator.

**V.    Gender Bias Against Plaintiff as the Male Accused**

215.   Pursuant to the U.S. Department of Education Office for Civil Rights' Guidelines, Clemson was required to conduct an impartial and unbiased investigation process.

216.   Upon information and belief, there are no reported incidents of male complainants against female students for sexual assault and/or there are no reports of female accused students being disciplined for sexual misconduct by male complainants at Clemson.

217.   Upon information and belief, Defendants are knowledgeable of the fact that complaints of sexual misconduct are disproportionately lodged by females against males.

218.   Upon information and belief, Defendants have recognized the increased pressure, both internally, and from the United States government to

aggressively discipline male students accused of sexual misconduct, under threat of rescission of federal funds.

219.   Defendants' response to this pressure is evident from a review of Clemson University's recent Annual Fire Safety & Security Reports (the "Clery Reports"). Indeed, Clemson's Clery Reports reveal that the number of forcible sex offenses reported on Clemson's campus has increased considerably, from only 2 reported instances in 2012 to 12 reports in 2014.

220.   Furthermore, Clemson University has recognized the disparate number of complaints filed by female students versus male students; during the 2013-2014 academic year, the number of male students investigated for misconduct was 1292 while the number of female students investigated for misconduct was 527. Similarly, the number of male students investigated during the 2014-2015 school year was 1301 while the number of female students was 534.

221.   In addition, the number of students investigated for allegations of the particular charges made against John Doe (alcohol, disorderly conduct, harm to person and sexual harassment) increased considerably from the 2013-2014 school year to the 2014-2015 school year: the number of alcohol violations increased 28%, disorderly conduct 38%, harm to person 50% and sexual misconduct by 67%.

222.   Defendants demonstrated a gender bias against John Doe as the male student accused of sexual misconduct when they found Jane Doe to be more credible despite her inconsistent and varying account of the events.

223.   Clemson's Policies are inherently discriminatory against respondents, who are invariably male.

224.   Clemson's guidelines and regulations are set up to disproportionately affect the male student population as a result of the higher incidence of female complainants of sexual misconduct against male complainants of sexual misconduct.

225.   For instance, the rights afforded to a complainant and respondent under Clemson's Code of Conduct are inexplicably disparate. In fact, the only right afforded to both parties is the right to choose an advisor to accompany the party to a hearing. The respondent is afforded the following rights:

- the right to remain silent;

- pending action on alleged violations will not alter the status of a student, nor shall the right to be present on campus to attend classes be suspended, except when an interim suspension has been imposed;

- the University may process a student's case separately from any action taken by the criminal justice system;

- prior cases of discipline will not be used against a student in determining whether the action is a violation of a student regulation; however, prior discipline can be used in determining a sanction;

- a university official shall inform students in writing of the reasons for any proposed disciplinary action in sufficient time to ensure that student has opportunity to prepare for a hearing;

- the student is responsible for contacting witnesses on his own behalf .

226.   Contrarily, the complainant is afforded the following rights which ensure greater protection of fundamental rights:

- the right to be informed of the discipline process prior to any disciplinary action;

- the right to attend the hearing and the option to provide testimony regarding the incident;

- to be informed in writing of the outcome of the disciplinary hearing;

- to be informed of any appeals filed by respondent;

- the right to appeal the finding of the disciplinary panel.

227.   Evidently, while the rights afforded to a complainant ensure the fundamental rights of notice and an opportunity to be heard, the same such rights are not guaranteed to a respondent under Clemson's Code of Conduct.

228.   Additionally, Clemson's Code of Conduct permits a complainant *three* opportunities to pursue a finding of responsibility against respondent, by allowing two levels of appeal. In essence, Clemson's Policies permit a form of triple jeopardy, affording the University three chances to find an accused student

responsible for the charges, and requiring a respondent to defend himself on three different occasions.

229.    Furthermore, Clemson's Code of Conduct provides that the director of Community and Ethical Standards and his/her designee may present the facts, circumstances and evidence on behalf of the University *or on behalf of the complainant* to the hearing board. Permitting the University to take on the role, or act on behalf of, the complainant creates a clear conflict of interest as the University is highly unlikely to reach a decision unfavorable to itself.

230.    Finally, while Clemson pursued the complaint filed by Jane Doe, conducted an investigation, prepared an Investigation Report and referred the matter to a Hearing, Defendants failed to pursue the same course of action with respect to John Doe's complaints against Jane Doe and Witness C.G.

231.    Though both parties were admittedly intoxicated at the time of the sexual encounter, Defendants failed to consider the effect of John Doe's incapacitation on his ability to affirmatively consent to the physical contact initiated by Jane Doe.

232.    In fact, within its definition of "Consent," Clemson's Code of Conduct specifically carves out respondent's intoxication as a factor to consider, stating "intoxication of the respondent is not an excuse for failure to obtain consent or failure to know of the complainant's inability to consent."

233.   Significantly, while Defendants found John Doe responsible for an alcohol violation, Defendants failed to similarly penalize Jane Doe for her admitted violations of Clemson's alcohol policy.

234.   Based on the foregoing, Defendants evidenced a clear gender bias against Plaintiff as the male accused throughout the investigation and hearing process, in violation of Title IX and his rights to fair process.

**VI.    Failure to utilize the requisite preponderance of the evidence standard.**

235.   The U.S. Department of Education Office for Civil Rights and Clemson's Policies require that a preponderance of the evidence standard be used to evaluate allegations of sexual misconduct. The Code of Conduct defines preponderance of the evidence as: "whether it is more likely than not that the referred student violated the Student Code of Conduct."

236.   The preponderance of the evidence standard does not equate to judging the accused as guilty until proven innocent. In fact, nowhere in the Department of Education's guidelines or Clemson's policies is such a standard referenced. However, Clemson's investigation process demonstrated a clear gender bias, which resulted in a Decision that did not afford Plaintiff the requisite presumption of innocence.

237.   Specifically, Defendants improperly placed the burden of proof on John Doe to establish that Jane Doe had consented to the sexual activity, when it

accepted at face value Jane Doe's allegations, notwithstanding her inconsistent statements and contradictory evidence.

238.    Throughout the investigation and hearing process, Defendants discriminated against John Doe as the male accused of misconduct.

239.    A fair reading of the evidence reveals that Jane Doe's account of the events lacked any corroboration or reliability:

- While Jane Doe claimed she had no recollection of the subject evening, H.S. and O.P. testified that Jane Doe texted her friends the following morning to thank them for taking care of her the night before.

- Resident Advisor L.S., who observed Jane Doe in the early morning of October 25 after returning home for the night was not concerned about Jane Doe's condition, indicated she was not slurring her words, and was clearly upset about her boyfriend standing her up.

- At 10:45 a.m. on October 25, prior to communicating with C.G., Jane Doe texted John Doe concerning the previous evening, and pleaded that he not say anything to C.G. about what had occurred between them.

- Jane Doe failed to submit to the Investigators the text message she sent to John Doe at 10:45 a.m., claiming she did not wake up again until 11:00 a.m. on the morning after the Incident. Conveniently, Jane Doe omitted this text message from her submission of evidence to OCES, as this would have refuted her testimony in which she stated she did not learn that she had engaged in sexual intercourse with John Doe until C.G. told her about it at 5:30 p.m. that evening.

- Her text message to John Doe time stamped at 10:45 a.m. also revealed that Jane Doe recalled being with John Doe the

previous evening and that he may have had the keys to her room.

- Thereafter, at 12:00 p.m. on October 25, Jane Doe told R.H. she had sexual intercourse with John Doe; Jane Doe indicated she was upset about C.G. having ignored her the previous evening and not being interested in pursuing a relationship with her.

- The text messages from the morning after the alleged Incident reveal that at no time did anyone inform Jane Doe that she had engaged in sexual intercourse with John Doe the previous evening; to the contrary, Jane Doe was well aware of what had occurred.

- Upon learning that C.G. found out about the encounter between her and John Doe, Jane Doe texted J.H. to tell her that C.G. discovered she had engaged in sexual intercourse with John Doe.

- Only after C.G. discovered that Jane Doe and John Doe had engaged in sexual intercourse and confronted her about it at approximately 5:30 p.m. on Sunday, October 25 did Jane Doe's account evolve.

- After speaking with C.G. about the alleged Incident, Jane Doe claimed for the first time that she did not recall anything from the previous evening and did not consent to the sexual encounter with John Doe.

- Upon information and belief, Jane Doe returned to the Phi Delta Theta fraternity house for a party the weekend following the alleged Incident. Jane Doe was met at the door by the Plaintiff, who said hello to her, and she continued on through the door to enter the house and stayed to attend the party.

- Notably absent from the Investigation Report was any mention of the alleged Incident to Clemson University Campus Safety. There also was no record of a report of the alleged Incident

made to the city of Clemson, South Carolina's police department.

- Jane Doe did not seek medical attention after the alleged sexual assault and there was therefore no medical record of evidence to suggest a sexual assault had ever occurred.

- Upon information and belief, two weeks after the alleged incident, Jane Doe sought medical treatment at for a concussion resulting from a fall when she was intoxicated.

- Jane Doe returned to the same off campus fraternity house, the following two weekends.

- Jane Doe should have been deemed less credible given the statements provided to the Investigators were inconsistent with her live testimony at the Hearing. For instance, she selectively recalled portions of the subject evening, at times recalling specific details including direct quotes at the time of the sexual encounter, while at other times she claimed to recall nothing at all about the alleged incident.

240.    The evidence undoubtedly demonstrates that Jane Doe not only recalled what happened between her and John Doe, but was upset because she did not want to hurt C.G. with her actions. Indeed, her account of alleged misconduct did not evolve until C.G. discovered what had occurred and confronted Jane Doe about it.

241.    Additionally, testimony of various witnesses reveals that the fact Jane Doe had engaged in sexual intercourse with John Doe did not become an issue until Jane Doe became aware of the anonymous OCES report, filed on her behalf. In fact, on October 25, 2015, when R.C. questioned Jane Doe about the encounter,

she "nonchalantly" replied that she had had sexual intercourse with John Doe behind Chipotle. Also of note, Jane Doe returned to John Doe's fraternity house the following two weekends.

242.    Moreover, L.S., as the only representative of Clemson to have direct contact with Jane Doe in the final moments of the subject evening, was a witness critical to the subject investigation. Indeed, she could have provided an unbiased and objective opinion as to Jane Doe's state of mind subsequent to the Incident. Nonetheless, Defendants neither interviewed her nor requested her appearance and testimony at the Hearing.

243.    Evidently, the investigators intentionally overlooked any evidence tending to diminish Jane Doe's credibility and/or exculpate John Doe.

244.    Accordingly, Defendants failed to utilize the requisite preponderance of the evidence standard when they found third-party witnesses to be more credible than John Doe despite the lack of any corroborating evidence, wholly discounted all exculpatory evidence, and presumed John Doe guilty from the outset. Defendants conducted an investigation designed to reach a predetermined result.

## AS AND FOR A FIRST CAUSE OF ACTION
### Violation of Title IX of the Education Amendments of 1972

245.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

246.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

247.    Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972, even though there is very little direct federal funding of school sports.

248.    Upon information and belief, Defendant Clemson receives federal funding for research and development.

249.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[2]

---

[2] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.

250.   The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also *"[accord] due process to both parties involved..."*[3]

251.   The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[4]

252.   A school also has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults." [5]

---

[3] *Id.* at 22 (emphasis added).
[4] *Id.* at 20.
[5] *Id.* at 21.

253.    Based on the foregoing, *supra,* at ¶¶ 166-244 Defendant Clemson deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection through the improper administration of and/or the existence, in its current state, of Defendant Clemson's guidelines and regulations.

254.    Based on the foregoing, *supra,* at ¶¶ 166-244 Defendant Clemson failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of the Incident and subsequent adjudication in a manner that was biased against Plaintiff.

255.    Clemson has created an environment where an accused male student is fundamentally denied due process by being prosecuted through the conduct process under a presumption of guilt. Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Clemson on the basis of his sex.

256.    Defendant Clemson had no intention of following its own policies and procedures for John Doe as the male accused of sexual misconduct when it erroneously found John Doe responsible for sexual misconduct despite the absence of any reliable or credible evidence.

257.    Clemson applied its stated policies and procedures and gender-biased practices in a manner that discriminated against Plaintiff on the basis of his sex and led to an erroneous and adverse outcome. Specifically:

- Defendants found Jane Doe to be more credible despite her inconsistent and varying account of the events, as presented within the Investigation Report and at the Hearing.

- Defendants enforced their inherently discriminatory policies against John Doe, for instance, by permitting Jane Doe to submit two appeals and thus subjecting John Doe to a form of double and triple jeopardy.

- Defendants violated John Doe's right against self-incrimination when they coerced him into providing a statement.

- Defendants precluded John Doe from exercising his rights under Clemson's policies when Defendant Smith threatened that if he filed complaints against Jane Doe and C.G., it would be considered retaliatory and grounds for his expulsion.

- Defendants lured John Doe into a false sense of security when they falsely assured him it would be in his best interests to cooperate and tell them everything.

- Defendants failed to afford John Doe a presumption of innocence when they overlooked all potentially exculpatory evidence and presumed John Doe guilty from the outset.

- Defendants failed to adequately consider and investigate John Doe's complaint against Jane Doe, in which he submitted that Jane Doe engaged in sexual activity with John Doe without his consent and engaged in subsequent harassing and retaliatory behavior.

- Defendants failed to require the appearance of J.H. at the Hearing; given her testimony in the Investigation Report directly contradicted Jane Doe's claims, she was a crucial witness concerning Jane Doe's credibility.

- During the Hearing, Defendant Frock demonstrated an inherent bias and partiality against John Doe as the male accused when he arbitrarily rejected a number of key questions posed by John

Doe, while accepting almost all of Jane Doe's submitted questions.

258.   Upon information and belief, Clemson possesses communications evidencing Defendants' inclination to favor female students alleging sexual misconduct over male students who are accused of sexual misconduct.

259.   Upon information and belief, Clemson has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

260.   Upon information and belief, all students that have been suspended from Clemson for sexual misconduct have been male.

261.   Upon information and belief, Clemson's mishandling of Plaintiff's investigation was informed by internal institutional pressure as well as external pressure from the United States Department of Education, under a threat of rescission of federal funds.

262.   Upon information and belief, in 2012, a Presidentially appointed task force was created at Clemson University in an effort to reduce the rates of sexual victimization and related negative consequences.

263.   As outlined above, the outcome was predetermined and simply a motion into a biased, prejudiced and implicitly unfair process, calculated to reach the conclusion that Plaintiff was responsible for the misconduct alleged.

264.    Based on the foregoing, Defendant Clemson imposed an unwarranted and excessive sanction on Plaintiff as a result of an erroneous outcome reached by a flawed investigation.

265.    Based on the foregoing, male respondents accused of sexual misconduct at Clemson are discriminated against solely on the basis of sex.  They are invariably found guilty, regardless of the evidence, or lack thereof.

266.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

267.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

268.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SECOND CAUSE OF ACTION
### Violation of the Fourteenth Amendment of the United States Constitution
### Procedural Due Process

269.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

270.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

271.   A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

272.   A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

273.   Plaintiff's constitutionally protected property interest in his continued enrollment at Clemson and to be free from arbitrary dismissal arises from the policies, courses of conduct, practices and understandings established by Clemson.

274.   Plaintiff's constitutionally protected property interest further arises from the express and implied contractual relationship between Clemson and Plaintiff.

275.   It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

276.   Thus, a person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his

education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

277.    As a result, if Plaintiff as a Clemson student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process Clemson used.

278.    Clemson, as a public university, has an absolute duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

279.    Under both federal and state law, Plaintiff had a constitutionally protected property interest in continuing his education at Clemson.

280.    Plaintiff was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff, and are quasi-criminal in nature.

281.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

282.    In the course of such investigation and adjudication, Clemson flagrantly violated Plaintiff's clearly established rights under the Due Process

Clause of the Fourteenth Amendment through its repeated acts of gender bias and of deprivation of the minimal requirements of procedural fairness.

283.   Upon information and belief, Clemson was pressured by the Department of Education into complying with the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter and by subsequent federal actions, statements, and directives.

284.   Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication, his right to be informed of the exact charges against him, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense. Rather than investigate what occurred on October 24, 2015, Defendants conducted a superficial investigation biased against Plaintiff as a male accused of sexual misconduct.

285.   As a result, Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide students accused of sexual misconduct.

286.   Defendants, as well as other agents, representatives, and employees of Clemson were acting under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

287.  Defendants all agreed to, approved, and ratified this unconstitutional conduct.

288.  As a result of these due process violations, Plaintiff continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages.

289.  Accordingly, Defendants are liable to Plaintiff for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

290.  As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

291.  As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A THIRD CAUSE OF ACTION
### Breach of Contract

292.  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

293.   Based on the foregoing, Clemson created express and implied contracts when Plaintiff accepted an offer of admission to Clemson and paid the tuition and fees.

294.   Based on the aforementioned facts and circumstances, Defendant Clemson breached express and/or implied agreement(s) with Plaintiff.

295.   Defendant Clemson committed several breaches of its agreements with Plaintiff during the investigation and hearing process. A non-exhaustive list of Clemson's breaches include the following:

**Alteration of John Doe's Status During Appeal.**

296.   Clemson's Policies provide that "pending action on alleged violations of University regulations or pending final disposition of any appeal, the status of a student shall not be altered..."

297.   Notwithstanding, Clemson erroneously altered John Doe's student status when Associate Dean Appling improperly submitted to University Housing and Dining an official university withdrawal on behalf of John Doe on March 24, 2016.

298.   As this University initiated withdrawal was submitted without John Doe's consent or knowledge, and while John Doe's appeal to Defendant Clements' was still pending, upon inquiry by John Doe, Dean Appling admitted that he had prematurely altered John Doe's student status.

299.   This event further evidenced the procedural incompetence and irregularities in Clemson's disciplinary process.

300.   Clemson breached its obligation to refrain from altering John Doe's student status during the pendency of his appeal, in violation of its own policies.

### Denial of the right to present relevant information.

301.   Clemson's Policies provide that "the referred student and complainant shall have the opportunity to present and examine statements, facts and any relevant information regarding the case."

302.   Nonetheless, John Doe was deprived of the opportunity to present information relevant to the case when Defendants failed to call Witness J.H. to testify at the Hearing.

303.   As the first person Jane Doe spoke with the morning following the alleged Incident, J.H.'s testimony was critical to establishing the veracity of Jane Doe's claims and demonstrating the credibility of each party under a preponderance of the evidence standard.

304.   While witnesses contacted by OCES are obligated to appear for a hearing, a respondent is left without any authority to compel the appearance of a witness he deems necessary, should they fail to comply.

305.   As such, because J.H. was not identified by the Investigators as a witness for the University to present, John Doe was required to procure her appearance on his own.

306.   However, as J.H. refused to appear voluntarily, and given his trepidation to communicate further with J.H. for fear of violating the No Contact Order, John Doe was left without recourse to compel her appearance; while OCES could have required J.H. to testify, it intentionally declined to do so, aware that her testimony would likely be exculpatory as to John Doe.

307.   Given J.H.'s testimony in the Investigation Report contradicted Jane Doe's testimony and was therefore directly relevant to her credibility, J.H. was a crucial witness that Defendants were required to identify.

308.   Accordingly, Defendants' failure to require the appearance and testimony of J.H. at the Hearing, combined with the limitations imposed on John Doe by the No Contact Order deprived John Doe of the opportunity to present information critical to his defense.

309.   Moreover, while Defendant Price acted as Primary Investigator, OCES inexplicably selected Defendant Jackson to testify at the Hearing about the findings in the Investigation Report. As she did not conduct any of the interviews personally, she was unable to explain why witness statements at the Hearing

contradicted those within the Investigation Report, and was unable to provide direct answers when questioned about the investigation.

310.   Defendants' failure to require the appearance of Investigator Price thus denied John Doe of the opportunity to question this critical witness, critically damaging the fairness and full disclosure necessary for a fair hearing.

311.   Therefore, Defendants violated their obligation to afford John Doe the opportunity to present and examine all statements, facts and relevant information regarding the case.

<u>**Failure to keep disciplinary records confidential.**</u>

312.   Clemson's Policies provide that "All student disciplinary records are kept confidential to the extent allowed by applicable state and federal laws. Generally, student conduct records requested by external institutions, agencies or individuals are available only upon the signed consent of the student…"

313.   Notwithstanding, Defendants allowed the disclosure of John Doe's confidential disciplinary records to the headquarters of John Doe's national fraternity.

314.   Specifically, on April 18, 2016 while both appeals to Defendant Clements remained pending, John Doe received notice from Phi Delta Theta Director of Chapter Services Michael Wahba that Province President Ron Johnson suspended John Doe from the fraternity, and recommended expulsion.

315.   Upon information and belief, this notice from the fraternity was prompted by the receipt of the confidential Decision Letter dated February 29, 2016, which was misrepresented as final.

316.   Upon information and belief, given the limited number of individuals with access to the Decision Letter, either Jane Doe, C.G. or a member of Clemson's administration disclosed this confidential document to a third-party, the Phi Delta Theta national headquarters, notwithstanding the pending appeal and a final determination.

317.   Thus, Defendants breached their contract with John Doe when they failed to maintain the confidentiality and privacy of his disciplinary record.

**Failure to ensure procedural questions resolved by Chairperson.**

318.   Clemson's Policies provide that during an administrative hearing, "All procedural questions are subject to the final decision of the chairperson."

319.   Yet, given Defendant Frock's evident lack of training and unfamiliarity with the proper protocol, he repeatedly deferred to Defendant Smith, as if she were the judge of the proceedings, to make a final ruling.

320.   While Clemson's Code of Conduct requires that all procedural questions are subject to the final decision of the chairperson at a hearing, Defendant Smith guided the proceeding by clarifying Defendant Frock's instructions, advising Defendant Frock as to how to resolve certain issues and

correcting Defendant Frock's numerous missteps- for instance, omitting an explanation of the burden of proof and misrepresenting the parties' ability to appeal.

321.   Accordingly, Defendants breached the contract with John Doe when all procedural questions at the Hearing were resolved by an individual who was excessively immersed in, and ultimately guided, the entire investigation process and findings against John Doe.

322.   Plaintiff is entitled to recover damages for Defendant Clemson's breach of the express and/or implied contractual obligations described above.

323.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

324.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

325.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

326.   Based on the aforementioned facts and circumstances, Defendant Clemson acted in bad faith when it meted out an erroneous Decision and disproportionate Sanction notwithstanding the flawed investigative process and lack of evidence in support of Jane Doe's allegations of sexual misconduct.

327.   Based on the aforementioned facts and circumstances, Defendant Clemson breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff.

328.   As a direct and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

329.   Plaintiff is entitled to recover damages for Defendant Clemson's breach of the express and/or implied contractual obligations described above.

330.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

331.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A FIFTH CAUSE OF ACTION
### <u>Negligence</u>

332.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

333.   Defendants owed a duty of care to Plaintiff, arising from the obligations delineated in Clemson's Policies, and directives issued by the U.S. Department of Education's Office for Civil Rights. Such duties included, without limitation, a duty of reasonable care to allow Plaintiff an equal opportunity to present information and witnesses in support of his defense; a duty of care to conduct an impartial and thorough investigation of the allegations of sexual misconduct against him; and a duty of care to utilize the preponderance of the evidence standard in reaching a determination.

334.   Based on the foregoing, Defendants breached their duties owed to Plaintiff.

335.   As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

336.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Promissory Estoppel

337.   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

338.   Clemson's Policies constitute unambiguous representations and promises that Clemson should have reasonably expected to induce action or forbearance on the part of Plaintiff.

339.   Clemson expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Clemson would not tolerate, and Plaintiff would not suffer, discrimination or harassment by fellow students or faculty members and would not deny Plaintiff his procedural rights should he be accused of a violation of Clemson's policies.

340.   Plaintiff reasonably and foreseeably relied to his detriment on these express and implied promises and representations made by Clemson, by choosing to attend Clemson rather than other schools of equal caliber and paying the required tuition and fees.

341.   These express and implied promises and representations made by Clemson must be enforced to prevent substantial injustice to Plaintiff.

342.   Based on the foregoing, Clemson is liable to Plaintiff based on Promissory Estoppel.

343.    As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

344.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Declaratory Judgment

345.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

346.    Clemson has committed numerous violations of the Parties' contracts and of federal and state law.

347.    Plaintiff's future educational and career prospects have been severely damaged. Without appropriate redress, the unfair outcome will continue to cause irreversible damages to Plaintiff's future educational and employment prospects, with no end in sight.

348.    As a result of the foregoing, there exists a justiciable controversy between the Parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at Clemson.

349.   By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Clemson be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from Clemson be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to Clemson for the Fall 2016 semester; and (vii) Clemson's rules, regulations and guidelines are unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)    on the second cause of action for violation of the Fourteenth Amendment of the United States Constitution Procedural Due Process, a

judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursement;

(iii)    on the third cause of action for breach of contract, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action for breach of the covenant of good faith and fair dealing, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for negligence, a judgment awarding John Doe damages in an amount to be determined at trial, including, without

limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vi)    on the sixth cause of action for promissory estoppel, a judgment awarding John Doe damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(vii)   on the seventh cause of action for declaratory judgment, a judicial declaration that (i) the outcome and findings made by Clemson be reversed; (ii) Plaintiff's reputation be restored; (iii) Plaintiff's disciplinary record be expunged; (iv) the record of Plaintiff's suspension from Clemson be removed from his education file; (v) any record of the complaint against Plaintiff be permanently destroyed; (vi) Plaintiff be readmitted to Clemson for the Fall 2016 semester; and (vii) Clemson's rules, regulations and guidelines are unconstitutional as applied; and

(viii)  awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

John Doe herein demands a trial by jury of all triable issues in the present matter.

**Dated: June 15, 2016**

**SCHMUTZ & SCHMUTZ, P.A.**

By:   s/*J. Stephen Schmutz*
**J. Stephen Schmutz, Esq.**
**24 Broad Street**
**Charleston, South Carolina 29401**
**(843) 577-5530**
steve@schmutzlaw.com

**DAVID AYLOR LAW OFFICES**

By:   s/*David Aylor*
**David Aylor, Esq.**
**24 Broad Street**
**Charleston, South Carolina 29401**
**(843) 577-5530**
david@davidaylor.com

**NESENOFF & MILTENBERG, LLP**

By:   s/*Andrew Miltenberg*
By:   s/*Tara J. Davis*
**Andrew T. Miltenberg, Esq. (admission**
***pro hac vice* pending)**
**Tara J. Davis, Esq. (admission *pro hac***
***vice* pending)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
amiltenberg@nmllplaw.com
tdavis@nmllplaw.com

***Attorneys for Plaintiff John Doe***

85